**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220349-U

Order filed December 31, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0349 Circuit No. 19-CM-1698 |
| | ) | |
| ASHISH GUPTA, | ) ) | The Honorable Arkadiusz Smigielski, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) Defendant's multiple convictions of violation of a stalking no contact order violated the one-act, one-crime doctrine. (2) The circuit court's act of admitting written jury instructions that did not require the jury to find that defendant knowingly violated the stalking no contact order, in convicting him of the offense of violation of a stalking no contact order, was harmless error. (3) The circuit court erred by failing to conduct a proper hearing prior to imposing a public defender fee.

¶ 2     This case arises from a stalking no contact order that the circuit court of Will County entered requiring defendant, Ashish Gupta, to remain at least 1,000 feet away from Anaisa Claudio and numerous specified places, including Claudio's places of employment and anywhere else she

might be. Defendant was subsequently charged with four counts of violating the stalking no contact order.

¶ 3    Prior to trial, $3,000 was posted in bond in this case, and the circuit court appointed a public defender after finding defendant indigent. Following a jury trial, defendant was convicted on all four counts, and while being sentenced, was ordered to pay a public defender fee. For the reasons that follow, we vacate defendant's conviction under one of the counts, affirm his convictions under the remaining counts, and remand this cause to the circuit court for a proper hearing on the public defender fee.

¶ 4                                    I.  BACKGROUND

¶ 5                          A. Stalking No Contact Order and Charges

¶ 6    On November 22, 2017, the circuit court entered a stalking no contact order (Order) that required defendant "to stay at least 1000 feet away from [Anaisa Claudio], [her] residence, school, daycare, employment and any other specified place." The Order also prohibited defendant from "entering or remaining at" Claudio's "place(s) of employment," located at 1188 W. Boughton Road and 230 N. Weber Road in Bolingbrook, Illinois, and "anywhere [Claudio] may be," when she is present. The Order stated that it was in effect until November 22, 2019.

¶ 7    On November 4, 2019, defendant was charged by an amended complaint with four counts of unlawful violation of a stalking no contact order. Count I of the amended complaint alleged that, around July 27, 2019, defendant remained within 1,000 feet of Andy's Frozen Custard located at 260 S. Weber Road in Bolingbrook, Illinois (Andy's), while Claudio was present. Count II alleged that, around July 29, 2019, defendant remained within 1,000 feet of Oberweis Dairy located at 230 N. Weber Road in Bolingbrook, Illinois (Oberweis), while Claudio was present. Count III alleged the same facts as Count II, except that it did not allege that Claudio was present

2

at Oberweis. Count IV alleged that, on August 4, 2019, defendant remained within 1,000 feet of Andy's, while Claudio was present.

¶ 8                                    B. Pretrial Proceedings

¶ 9        Bond in this case was originally set at $20,000, with 10% to apply. The State subsequently filed a motion to modify defendant's bond, on the basis that defendant had posted $5,000 in bond in other proceedings against him. During hearing on this motion, the circuit court noted defendant's affidavit of assets and liabilities, in which he indicated that he had no source of income, and asked defendant how he was able to post the $5,000 in bond without any income. After defendant explained that his mother provided the $5,000 in bond money, the circuit court deemed defendant indigent, appointed a public defender to represent him, and required him to pay an additional $1,000 in bond, which was later posted.

¶ 10       On April 26, 2021, the circuit court granted the public defender's motion to withdraw as counsel because defendant had posted over $16,000 in bond across his various proceedings. The State later filed a motion to reconsider allowing the public defender to withdraw, arguing that the fact that defendant had posted bond did not preclude him from being found indigent. Hearing was held on this motion, during which, the following exchange occurred:

> "THE DEFENDANT: But, in any case, Judge, would State agree, if I accept the public defender, would they agree not to seek, at a later point, attorney's fees from the bond funds? Because those—those are not my bond funds. I mean, they're the bond posted for me, but, as it says in the motion, those are not my funds—
>
> THE COURT: Sir, appointment of a public defender pursuant to this statute—and I'm going to answer that question. I'm not even going to ask them to answer it.

*****

THE COURT: The bond slip says, [e]ven to surety, that the funds may be used for court costs, for fines. And I believe the assessment of potential public defender fees would fit within that.

So, while the Appellate Court, may say I'm wrong in determining you are not indigent because you have significant bond up and that you could afford to hire a private lawyer, I do not believe that this case law extends to the point of court costs and attorneys— or court costs, fines, which I believe includes—excuse me—assessment to reimburse the public defender for their time.

So, if they make the motion, I will rule on it."

Noting that defendant's mother paid the bond money posted in his cases, the circuit court granted the State's motion for reconsideration, again found defendant indigent, and reappointed a public defender to represent him.

¶ 11                                    C. Trial

¶ 12       On February 14, 2022, a jury trial commenced on all four counts of the amended complaint. At trial, a copy of the Order was admitted into evidence. A Will County sheriff testified that, on December 14, 2017, he personally served defendant with a copy of the Order and read its restrictions aloud to defendant. The Order did not contain a photograph or description of Claudio, and the sheriff did not provide information about her to defendant.

¶ 13       A Bolingbrook police officer testified that, on January 14, 2012, he was called to a Dunkin Donuts in Bolingbrook, where an adult male customer told him that defendant, who was present, was photographing him and his daughter. When the officer asked defendant whether this was true, defendant admitted that he was taking pictures and explained that he had obsessive-compulsive disorder that made him take pictures and that he "couldn't control it." The officer looked through

4

defendant's phone, and while he did not see photographs of the customer or his daughter, the officer did see 331 photographs that were taken that day of customers in Dunkin Donuts and of "[v]arious females in different locations around Bolingbrook."

¶ 14        Claudio testified that she had never been acquainted with or had a personal interaction with defendant, but that she had seen him before August 15, 2017, and could have possibly served him as a customer through her work prior to that same date. On August 15, Claudio was working alongside coworkers inside Oberweis. While two or three customers were also present inside, defendant parked outside the store and pointed his phone through the front windows. Claudio believed that defendant was photographing her because he was pointing his phone in her direction, and she saw the flash emitting from his phone. The customers were also visible to defendant from where he was parked.

¶ 15        On October 7, 2017, Claudio was working at a Target located at 1188 W. Boughton Road in Bolingbrook, Illinois (Target). When Claudio exited the Target building to go to her vehicle during her break, she saw defendant inside his vehicle, which was parked to the side of a driving lane between the building and the parking lot. Defendant was pointing his phone in Claudio's direction. Believing that he was either photographing or recording her, Claudio felt scared and ran to her vehicle and ducked down inside of it. After some minutes, Claudio peeked out of her window and saw that defendant had parked his vehicle in the no-parking spot next to hers, with his vehicle facing the opposite way relative to her own. Claudio ducked down for another few minutes before exiting her vehicle and reentering the Target building, while defendant remained inside his vehicle.

¶ 16        Claudio subsequently filed a petition for the Order, which listed the addresses of Oberweis and Target as her places of employment. Around April 2019, Claudio stopped working at Oberweis

and began a new job at Andy's. Claudio did not seek to update the Order to list the Andy's address as one of her places of employment.

¶ 17          On July 27, 2019, Claudio was working the drive-through window at Andy's and wearing her work uniform when she saw defendant park his vehicle in the further of the two lanes outside of the drive-through window for one to two minutes. During that time, Claudio observed defendant point his phone in her direction, and she believed that he was either photographing or recording her. Defendant then drove his vehicle to the street outside the outdoor patio at Andy's, parked his vehicle along the side of the street, and photographed the customers sitting at the outdoor patio for one to two minutes before driving away.

¶ 18          Around 20 minutes later, defendant returned and again parked in the outer lane outside the drive-through window at Andy's for one to two minutes, during which time he again pointed his phone in Claudio's direction, and she believed that he was either photographing or recording her. Defendant then drove away, and Claudio saw that defendant's vehicle had a Florida license plate.

¶ 19          On July 29, 2019, after Claudio had stopped working at Oberweis, she visited the store as a customer and ate inside with friends. Claudio, her friends, and Oberweis employees were the only people present inside Oberweis when defendant parked his vehicle in the parking lot outside the store and pointed his phone toward Claudio, who believed that he was photographing or recording her through the window. Claudio and her friends went outside to photograph defendant's license plate. When defendant saw them come outside, he stopped pointing his phone and quickly drove away. Claudio was able to photograph the license plate number on the rear of defendant's vehicle. She later went to the police station to report both this and the July 27, 2019, encounters with defendant.

¶ 20    On August 4, 2019, Claudio was again working the drive-through window at Andy's. Defendant again parked his vehicle in the outer lane outside the drive-through window and pointed his phone toward Claudio while she was interacting with a customer and her coworker was bagging an order. Claudio believed that defendant was photographing or recording her and called the police. Defendant left before they arrived.

¶ 21    A Bolingbrook police officer testified that, on August 5, 2019, he visited defendant's address and photographed the vehicle in the driveway. The vehicle had the same license plate number that Claudio photographed on July 29.

¶ 22    Recognizing that there were no Illinois Pattern Jury Instructions (IPI) for the offense of violation of a stalking no contact order, the State tendered non-IPI instructions that were modeled from the IPI 11.77 and 11.78 instructions for violation of an order of protection. None of the jury instructions tendered by the State included the term "knowingly" before describing the act that defendant allegedly committed in violation of the Order. Defendant objected to the instructions on this ground, and the circuit court submitted the instructions to the jury over his objection.

¶ 23    The jury instructions for Counts II and III were the same, except for one aspect. Relevant to Count II, the jury was instructed that, to convict defendant, the unlawful act that it had to find beyond a reasonable doubt that he performed was that, on July 29, 2019, he remained within 1,000 feet of Oberweis, where Claudio was present. As to Count III, the jury was instructed that the unlawful act was that, on July 29, 2019, defendant remained within 1,000 feet of Oberweis, and that, to convict defendant, it needed to find beyond a reasonable doubt that a stalking no contact order prohibited him from performing that act. The jury convicted defendant on all four counts.

¶ 24                    D. Posttrial Proceedings and Sentencing

7

¶ 25    On March 11, 2022, defendant filed a motion for a new trial, arguing in part that the circuit court erred by submitting the State's tendered jury instructions without the term "knowingly" being used in each count. On May 19, 2022, the circuit court denied the motion for a new trial and sentenced defendant to concurrent terms of 24 months' probation and 361 days in jail. The following exchange then occurred in court:

"THE COURT: Fines, costs and fees. This gentleman has bond up a very significant sum of money on a variety of cases. In this particular case, there is $3,000 posted in bond. I am not going to take bond from any of his other case[s] to satisfy this one, so the total financial obligation in this case as it relates to the fines, costs and fees is $2,495.

The Public Defender is awarded Public Defender fees from the defendant's bond money. I believe the maximum amount that I can impose is $505. So $505 plus the $2,495, I believe, will total the $3,000 posted as bond in this case. So bond to apply to cover that financial obligation.

Mr. Strupeck.

MR. STRUPECK [DEFENSE COUNSEL]: Judge, just on the issue of Public Defender fees, we'd be objecting.

THE COURT: Over your objection, you will be paid anyway, Mr. Strupeck. I should say your office will * * *."

On a written probation order file-stamped with the date of May 19, 2022, the circuit court wrote that the public defender fees totaled $500 to be taken from bond, and in a financial sentencing order file-stamped that same day, the circuit court ordered defendant to pay $505 in public defender fees.

¶ 26                                    II. ANALYSIS

¶ 27         A. Ambiguity of the Stalking No Contact Order

¶ 28  We note in beginning this analysis that defendant has not challenged the reasonableness or validity of the Order, and so those questions are not before us. We, therefore, only consider whether the decision that defendant violated the Order was legally correct. Defendant first argues that his conviction under Count III for violation of a stalking no contact order should be reversed because it is ambiguous whether the Order prohibits his alleged conduct. A person commits the offense of violation of a stalking no contact order when: (1) "he or she knowingly commits an act" prohibited by a court in a valid stalking no contact order, and (2) "the violation occurs after the offender has been served notice of the contents of the order . . . or otherwise has acquired actual knowledge of the contents of the order." 720 ILCS 5/12-3.9 (West 2018).

¶ 29  In pertinent part, the Order prohibits defendant from entering or remaining at Claudio's "places of employment located at [Oberweis and Target]," and "anywhere [that Claudio] may be." Claudio's employment with Oberweis having ended prior to the alleged events at Oberweis on July 29, 2019, defendant argues that the Order is ambiguous because it is unclear whether it prohibited him from entering or remaining at Oberweis even after Claudio's employment there ended and Oberweis was, consequently, no longer one of her "places of employment."

¶ 30  As an initial matter, the parties dispute the proper standard of review for this issue. Whereas defendant argues that the court should apply the *de novo* standard of review, the State argues in favor of the *Collins* standard of review, under which a reviewing court must view the evidence in a light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 188. Although recognizing that the *Collins* standard of review generally applies to sufficiency-of-the-evidence arguments (see *People v. Lovings*, 275 Ill. App. 3d 19, 22 (1995)

(explaining that the *Collins* standard of review is appropriate for sufficiency-of-the-evidence arguments)), defendant argues that *de novo* review applies here because the question is whether an undisputed set of facts was sufficient as a matter of law to prove an element of the offense.

¶ 31    Defendant cites to *People v. Smith*, 191 Ill. 2d 408 (2000), to support his argument. In *Smith*, our supreme court reviewed *de novo* the defendant's argument that the lower courts erred by finding that he committed the offense of armed violence, because the facts were not in dispute. 191 Ill. 2d at 411. The court then went on to consider how it had construed the relevant statute in the past, before finding that the defendant did not commit the offense of armed violence. *Id.*, at 411–12. As the State correctly points out, in *People v. Jones*, 2023 IL 127810, the court later explained that it applied the *de novo* standard of review in *Smith* to determine whether the undisputed facts regarding the defendant's action constituted armed violence "*within the meaning of the statute*." 2023 IL 127810, ¶ 24 (emphasis added).

¶ 32    Resolving the present issue does not require us to construe the governing statute. It does, however, require us to construe the language of the Order to determine whether it is ambiguous. Consequently, we will adopt the *de novo* standard of review. See *People v. Davit*, 366 Ill. App. 3d 522, 527 (2006) (applying statutory construction principles in construing the language of an order of protection); *People v. Kohl*, 364 Ill. App. 3d 495, 499 (2006) (explaining that *de novo* review is applied in all cases of statutory construction).

¶ 33    Applying the rules of statutory interpretation, courts construe an order of protection by giving effect to its plain language and interpreting the order as written. *Davit*, 366 Ill. App. 3d at 527. If the language of the order can be reasonably interpreted in more than one way, then it is ambiguous and the principle of lenity is applied. *Id*. "Under this principle, the language of the order must be strictly construed in favor of the accused." *Id*.

¶ 34	Defendant seemingly argues that the term "places of employment," as used in the Order, can be reasonably understood to refer both to: (1) places where Claudio was employed at the time when the Order was entered, for only so long as she remained employed there, and (2) places where Claudio was employed at the time when the Order was entered, for the entire duration of the Order's effect, regardless of whether Claudio's employment there later ended. Defendant argues that these two possible interpretations of the term "places of employment" render the Order ambiguous. We reject this argument, for numerous reasons.

¶ 35	To start, the Order labels Oberweis as one of Claudio's places of employment and has an effective period exceeding the time when Claudio's employment with the store ended. Otherwise stated, the circuit court's decree in the Order is that Oberweis qualifies as one of Claudio's places of employment, and because the Order and the decrees therein were to remain in force throughout the effective period of the Order, which exceeded when Claudio's employment at Oberweis happened to end, one could reasonably interpret the Order to mean that Oberweis remains one of Claudio's places of employment for the full duration of the Order.

¶ 36	Further support for the reasonableness of this interpretation is that the Order is devoid of any language that references the amount of time that Claudio was to actually be employed at either Oberweis or Target, including the possibility of her employment at either store ending. Under the rules of statutory interpretation, a court may not add provisions into the language it is reviewing, nor may a court depart from the plain language by reading into it exceptions, limitations, or conditions that the drafter did not express. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 408 (2010). Because the circuit court in this case did not expressly limit Oberweis from qualifying as one of Claudio's places of employment if her employment with the store ever happened to end, it is reasonable for one to understand the Order to mean that Claudio's actual

11

employment status with the store is irrelevant to its qualification as one of her places of employment, for purposes of the Order. This, in turn, makes it even more reasonable for one to interpret the Order to mean that Oberweis remained one of Claudio's places of employment even after her actual employment with the store ended.

¶ 37       For reasons similar to those underlying our finding that defendant's second proposed interpretation is reasonable, we further find his first proposed interpretation to be unreasonable. We also note that both of our findings are also guided by the implications that would follow if we were to instead find defendant's first proposed interpretation to be reasonable. As defendant himself points out, Claudio never sought amendment of the Order on the basis that her employment with Oberweis ended during the Order's effective period. This makes it unclear how defendant would have known at the time of the events alleged under Count III that Claudio's employment at Oberweis had already ended, other than by, perhaps, entering or remaining at Oberweis as prohibited by the Order, on no more than the mere hunch that she no longer worked there. As this illustrates, to deem defendant's first proposed interpretation as reasonable would be to sanction one's act of entering or remaining at another's places of employment, when that act is prohibited by a stalking no contact order and performed on no more than a suspicion that the protected party is no longer employed there. Such a result would be untenable. Therefore, we reject defendant's first proposed interpretation as unreasonable and find that the Order is not ambiguous pertaining to its inclusion of the term "places of employment."

¶ 38                               B. One-Act, One-Crime Violation

¶ 39       Next, defendant argues that Count III should be vacated on one-act, one-crime grounds. The one-act, one-crime doctrine prohibits a defendant from being convicted of multiple crimes when (1) they are based on precisely the same physical act, or (2) one of the crimes is a lesser-

12

included of the other. *People v. Lindsey*, 324 Ill. App. 3d 193, 200 (2001). A reviewing court must first determine whether the defendant's conduct constituted a single act or multiple acts. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). "Multiple convictions are improper if they are based on precisely the same physical act." *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). "In this context, 'act' means 'any overt or outward manifestation which will support a different offense.' " *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 24.

¶ 40 If the court determines that the defendant's convictions stemmed from multiple acts, then the court proceeds to the second step of determining whether any of the crimes are lesser-included crimes. *Harvey*, 211 Ill. 2d at 389. If so, then the multiple convictions are improper. *People v. Johnson*, 368 Ill. App. 3d 1146, 1163 (2006). We review *de novo* whether multiple convictions violate the one-act, one-crime doctrine. *People v. Hamerlinck*, 2018 IL App (1st) 152759, ¶ 53.

¶ 41 Counts II and III in this case charge defendant for remaining within 1,000 feet of Oberweis on July 29, 2019. Defendant argues that, as such, his convictions under both counts are based on the single act of him remaining within 1,000 feet of Oberweis. In response, the State characterizes defendant's act of remaining within 1,000 feet as an act common to both counts. The State argues that, despite Counts II and III sharing this common act, defendant's convictions under both counts are proper because defendant's presence within 1,000 feet of Oberweis, as charged under Count III, was a separate act from defendant's presence within 1,000 feet of Claudio, as charged under Count II.

¶ 42 As the State points out, "[a] person can be guilty of two offenses when a common act is part of both offenses * * *." *People v. Lobdell*, 121 Ill. App. 3d 248, 252 (1983). However, in cases in which multiple convictions have been sustained based on a common act, there was at least one other act performed by the defendant in addition to that common to the multiple offenses. See,

13

*e.g.*, *People v. Marston*, 353 Ill. App. 3d 513, 519 (2004) (holding that multiple convictions for home invasion and aggravated battery were proper, despite the common act of hitting the victim with a pole, because the defendant's entry into the home was a separate act that supported the home invasion conviction); *People v. McLaurin*, 184 Ill. 2d 58, 105 (1998) (sustaining separate convictions for intentional murder and home invasion because, although both involved the common act of setting a fire, the defendant's additional act of entering the victim's dwelling was a separate act that supported the home invasion offense).

¶ 43   Here, although Counts II and III share the common act of defendant remaining within 1,000 feet of Oberweis, the State does not allege an additional act performed by defendant that supports his conviction under one count and not the other. Consequently, we vacate defendant's conviction under Count III, for violation of the one-act, one-crime doctrine.

¶ 44                                    C. Jury Instructions

¶ 45   Defendant also argues that the circuit court erred by admitting jury instructions that inaccurately conveyed the applicable law governing each of the four counts. "Whether the jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*." *People v. Hartfield*, 2022 IL 126729, ¶ 51. " 'We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *Id.* (quoting *People v. Parker*, 223 Ill. 2d 494, 501 (2006)).

¶ 46   "The due process clause of the fourteenth amendment protects a defendant from conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Green*, 225 Ill. 2d 612, 622 (2007) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Thus, to ensure a fair trial, the circuit court must instruct the jury on basic matters such as the elements of the offense, the presumption of innocence, and the burden of proof.

*People v. Sanders*, 393 Ill. App. 3d 409, 412 (2009). However, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (internal citation omitted). "Rather, 'taken as a whole, the instructions must correctly convey the concept of a reasonable doubt to the jury.' " *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

¶ 47    All four counts of the amended complaint charge defendant with the offense of violation of a stalking no contact order, for which no IPI jury instructions exist. At trial, the State instead offered non-IPI jury instructions for each of the four counts that modeled the IPI 11.77 and 11.78 instructions for the separate offense of violation of an order of protection, and the circuit court admitted the instructions over defendant's objection.

¶ 48    IPI instruction 11.77, effective January 1, 1990, states the following:

"A person commits the offense of violation of an order of protection when, having been served notice of the contents of an order of protection, or otherwise having acquired actual knowledge of the contents of the order, he [(commits an act which was prohibited by a court) (fails to commit an act which was ordered by a court)] in an order of protection." Illinois Pattern Jury Instructions, Criminal, No. 11.77 (1990).

Separately, IPI instruction 11.78, effective the same date, states that, to sustain a charge of violation of an order of protection, the State must prove, among other things, that the defendant performed the alleged act, and that, at the time when the defendant performed the alleged act, he had been served notice of the contents of the order of protection or had otherwise "acquired actual knowledge of the contents of the order." Illinois Pattern Jury Instructions, Criminal, No. 11.78 (1990).

15

¶ 49    When IPI instructions 11.77 and 11.78 first went into effect, section 12-30(a) of the Illinois Criminal Code provided that a person commits the offense of violation of an order of protection when "[h]e or she commits an act which was prohibited by a court" in a valid order of protection. 720 ILCS 5/12-30(a) (West 1986). This section further provided that "[s]uch violation occurs after the offender has been served notice of the contents of the order, . . . or otherwise has acquired actual knowledge of the contents of the order." *Id*.

¶ 50    Beginning July 1, 2019, section 12-30(a) now provides that a person commits the offense of violation of an order of protection when "[h]e or she *knowingly* commits an act which was prohibited by a court" in a valid order of protection. 720 ILCS 5/12-3.4(a) (West 2019) (emphasis added). The section continues to require that the offender be served with notice of the contents of the order of protection, or that the offender acquire actual notice of said contents. *Id*. Section 3.9 of the Illinois Criminal Code, which governs the offense of violation of a stalking no contact order, has always required findings that the offender "knowingly" committed the act proscribed by the order, and that the offender either was served notice of the contents of the order or acquired actual knowledge of the contents, to sustain his conviction. 720 ILCS 5/12-3.9 (West 2018).

¶ 51    Defendant argues that the written instructions submitted to the jury inaccurately conveyed the law governing the offense of violation of a stalking no contact order because they did not reflect the current state of the law governing the offense of violation of an order of protection in that they did not require the jury to find that he "knowingly" performed the alleged acts violating the Order, to convict him. The State disagrees, citing as support *People v. Hoffman*, 2012 IL App (2d) 110462.

¶ 52    In *Hoffman*, the defendant was convicted of violation of an order of protection, under the version of section 12-30(a) effective prior to 2019. 2012 IL App (2d) 110462, ¶ 1. On appeal, the defendant argued that the instructions submitted to the jury were improper because they did not

16

indicate the mental state with which he must have acted to be convicted of violation of an order of protection. *Id*. ¶ 11. The court noted that the required mental state was that the defendant had actual knowledge that his acts were prohibited, and that the submitted instructions stated that he could be convicted of violating the order of protection if the jury found that he had actual knowledge of the contents of the order. *Id*. ¶¶ 13, 14. However, the defendant further argued that " 'knowledge of the contents of an order of protection and knowledge that a person is violating that order are two separate and distinct concepts,' " and pointed out that the instructions omitted the latter concept. *Id*. ¶ 15. The court rejected the defendant's argument, which it characterized as "present[ing] a distinction without any real difference." *Id*. The court explained that, "[w]hen a defendant has knowledge of the contents of an order of protection, it necessarily follows that, when he does some act in contravention of the terms of the order of protection, he does so with knowledge that those acts are prohibited." *Id*.

¶ 53         The *Hoffman* decision predates the 2019 amendment to section 12-30(a) requiring an offender to have "knowingly" performed the alleged act in violation of the order of protection, to be convicted of the offense. Thus, although the *Hoffman* court rejected the argument there that the jury needed to also find that the defendant knowingly violated the order of protection to convict him, we do not reject defendant's analogous argument here. Instead, we find that the jury was required to be instructed that it needed to find that defendant knowingly violated the Order to convict him under each count of the amended complaint. To find otherwise would be to render meaningless the legislature's inclusion of the term "knowingly" in section 3.9 of the Illinois Criminal Code, which we cannot do. See *Staisz v. Resurrection Physicians Provider Group, Inc.*, 2022 IL App (1st) 201316, ¶ 17 (explaining that no word, clause, or sentence of a statute should be rendered superfluous when engaging in statutory interpretation). Thus, the circuit court erred

17

by submitting written instructions that did not require the jury to find that defendant knowingly violated the Order to convict him.

¶ 54    However, the State argues that the circuit court's error regarding the jury instructions was merely harmless in nature. "A jury instruction error is harmless if the result of the trial would not have been different if a proper instruction had been given." *People v. Mercado*, 333 Ill. App. 3d 994, 1000 (2002). Our supreme court has delineated a two-part test constituting the harmless-error analysis, under which we must first determine "whether any error occurred—in other words, whether the instruction was correct." *People v. Dennis*, 181 Ill. 2d 87, 95–96 (1998). If there was error in the jury instruction, then, second, we must determine "whether, in spite of that error, evidence of [the] defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt." *Id*. at 96.

¶ 55    Relevant to the first prong of the harmless-error analysis, we have already found that there was error in the written instructions submitted to the jury on each of the four counts. Thus, turning to the second prong of the analysis, the only remaining determination to be made is whether the evidence of defendant's guilt was so clear and convincing as to render this error harmless beyond a reasonable doubt. Further, because we have already determined that Count III of the amended complaint should be vacated on one-act, one-crime grounds, we will not analyze it here and will instead limit our harmless-error analysis to Counts I, II, and IV of the amended complaint.

¶ 56    The only element that defendant challenges under each of the three remaining counts is that pertaining to whether he "knowingly" violated the Order. "Knowledge generally refers to an awareness of the existence of the facts which make an individual's conduct unlawful." *People v. Gean*, 143 Ill. 2d 281, 288 (1991). Section 4-5 of the Illinois Criminal Code provides the following:

"A person knows, or acts knowingly or with knowledge of:

18

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5 (West 2018).

¶ 57    As earlier noted, the Order prohibits defendant in this case from entering or remaining at Claudio's places of employment, including Oberweis, and "anywhere [Claudio] may be," when she is present. Count II alleges that, around July 29, 2019, defendant violated the Order by remaining within 1,000 feet of Oberweis while Claudio was present.

¶ 58    Relevant to defendant's conviction under Count II, at trial, Claudio testified that, on July 29, she was visiting Oberweis and eating inside with her friends and Oberweis employees present when defendant parked his vehicle outside the store and pointed his phone toward her. Claudio testified that she believed that defendant was photographing or recording her, and that she took a picture of the license plate number on the back of defendant's vehicle as he subsequently drove away. A Bolingbrook police officer later testified that this license plate number matched that of a vehicle that the officer observed parked outside of defendant's residence.

¶ 59    The jury was permitted to credit the above testimony of Claudio and the Bolingbrook police officer, and to infer from it that, on July 29, 2019, defendant indeed remained within 1,000 of Oberweis while Claudio was present, in contravention of the Order. *People v. Watkins*, 309 Ill. 318, 321 (1923) (explaining that the question of witness credibility is within the province of the jury). However, the next issue to be resolved is whether there was sufficient evidence from which

19

the jury could have inferred that defendant knowingly violated the Order as alleged under Count II. Defendant argues that there was insufficient evidence in this respect because the nature of the evidence presented at trial was such that it remained unclear whether he actually knew who Claudio was to, in turn, know that she was indeed present at the time of the alleged events.

¶ 60　　At trial, Claudio also testified that, three times prior to the events alleged under Count II, on August 15 and October 7, 2017 and July 27, 2019, respectively, she observed defendant at her work location, pointing his phone toward her in what she believed to be an act of photographing or recording her. In turn, defendant points out that the State did not submit evidence of any of the actual photographs or videos that he allegedly took of Claudio during these previous incidents, which might have otherwise demonstrated to the jury he was actually and specifically targeting her. Defendant also points out that there were others near Claudio during two of her previous encounters with him, seemingly suggesting that he could have been photographing or recording these other individuals instead of Claudio. We also note from our review of the record that the Order does not contain a photograph of Claudio, and that the Will County sheriff who served the Order upon defendant testified at trial that he never provided defendant any information regarding Claudio.

¶ 61　　It is true that both defendant's points and our own observations from the record offer some modicum of support for an inference that defendant did not actually know who Claudio was at the time of the alleged events under Count II. However, defendant's overall argument nevertheless fails for numerous reasons. First, there was still nothing before the jury that prevented it from crediting Claudio's testimony regarding the previous incidents, most notably her belief that defendant had photographed or recorded her specifically. In turn, the jury could have still inferred from this testimony alone that he did in fact know who she was.

¶ 62 Second, even if defendant did not actually know who Claudio was, there was still sufficient evidence from which the jury could have inferred that he was at least aware of the substantial probability that he was photographing or recording Claudio in particular and violating the Order. Returning to the *Hoffman* decision, although we earlier diverged from that court's findings in other ways, we still find persuasive the court's statement that, when a defendant has knowledge of the contents of an order or protection, it necessarily follows that any contravention of the order is done while knowing that the act was prohibited. *Hoffman*, 2012 IL App (2d) 110462, ¶ 15. As we earlier noted, a Will County sheriff testified that he personally served defendant with a copy of the Order, which prohibited defendant from entering or remaining at Claudio's places of employment, which included Oberweis. Yet, during the July 29, 2019, events, defendant was alleged to be at that very same Oberweis. There was no evidence presented to the jury that suggested that defendant was unaware of the contents of the Order or that he was unconscious of the fact that he was right outside Oberweis when alleged. Accordingly, the evidence of defendant's guilt under Count II was clear and convincing and the circuit court's error regarding the jury instructions was harmless with respect to this count.

¶ 63 Counts I and IV each alleges that defendant remained within 1,000 feet of Andy's, while Claudio was present, on July 27, 2019 and August 4, 2019, respectively. Relevant to defendant's conviction under these counts, at trial, Claudio testified that, on both dates, she was working the drive-through window at Andy's, when she observed defendant park his vehicle in the outer lane outside the drive-through window and point his phone toward her. Claudio also testified that both her coworkers and customers were present, but that she believed that defendant was specifically photographing or recording her.

21

¶ 64    For reasons similar to those that we articulated with respect to Count II, we find that Claudio's testimony, especially when it is combined with that of the Will County sheriff and Bolingbrook police officer, constitutes sufficient evidence for the jury to have found that defendant knowingly remained within 1,000 feet of Andy's on both July 27, 2019 and August 4, 2019, while Claudio was present. We further find that the evidence of defendant's guilt under Counts I and IV was likewise clear and convincing and that the circuit court's jury instructions error was harmless with respect to these counts as well.

¶ 65                                    D. Public Defender Fee

¶ 66    Last, defendant argues that the circuit court erred by imposing a public defender fee without first providing him proper notice or the opportunity to present evidence regarding his ability to pay. We will review *de novo* the circuit court's issuance of the public defender fee. See *People v. Aguirre-Alarcon*, 2016 IL App (4th) 140455, ¶ 9 ("Whether the court properly imposed the public-defender-reimbursement fee is a question of law, which we review *de novo*.").

¶ 67    Section 113-3.1 of the Code of Criminal Procedure provides the following, in pertinent part:

    "(a) Whenever . . . the court appoints counsel to represent a defendant, the court may order the defendant to pay . . . a reasonable sum to reimburse [] the county . . . for such representation. In a hearing to determine the amount of the payment, the court shall consider the affidavit prepared by the defendant . . . and any other information pertaining to the defendant's financial circumstances * * *. Such hearing shall be conducted on the court's own motion or on motion of the prosecutor at any time after the appointment of counsel but no later than 90 days after the entry of a final order disposing of the case at the trial level.

22

(b) Any sum ordered paid under this Section may not exceed $500 for a defendant charged with a misdemeanor * * *." 725 ILCS 5/113-3.1 (West 2019).

¶ 68        On October 3, 2019, the circuit court appointed a public defender to represent defendant in this case, and then later permitted the public defender to withdraw as counsel. On January 6, 2022, the circuit court re-appointed a public defender to represent defendant, following a hearing on the matter. During the hearing, which occurred prior to trial, defendant asked whether the State would agree not to seek public defender fees from his bond funds, because the funds were paid by his mother. The circuit court responded by explaining to defendant that it would rule on the issue once a motion was brought pertaining to it. Neither the State nor the appointed public defender ever brought a motion seeking public defender fees. During the May 19, 2022, sentencing hearing, the circuit court imposed a $505 public defender fee without previously providing notice to defendant or permitting him time to submit evidence regarding his ability to pay.

¶ 69        Defendant cites to *People v. Somers*, 2013 IL 114054, to support his argument that the circuit court acted in error. In *Somers*, the court explained the following regarding section 113-3.1 of the Code of Criminal Procedure:

"To comply with the statute, the court may not simply impose the fee in a perfunctory manner. [Citation.] Rather, the court must give the defendant notice that it is considering imposing the fee, and the defendant must be given the opportunity to present evidence regarding his or her ability to pay and other relevant circumstances. [Citation.] The hearing must focus on the cost of representation, the defendant's financial circumstances, and the foreseeable ability of the defendant to pay. [Citation.] The trial court must consider, among other evidence, the defendant's financial affidavit. [Citation.]" *Somers*, 2013 IL 114054, ¶ 14 (internal citation omitted).

23

¶ 70 Here, the circuit court did not provide defendant advance notice that it would be imposing the public defender fee. As the State points out, the circuit court did note before imposing the fee that there was $3,000 posted in bond in this case, and, during pretrial proceedings, had reviewed defendant's affidavit of assets and liabilities and heard from defendant that the bond funds posted in this case were paid entirely by his mother and not by him. However, the court did not provide defendant any opportunity to submit evidence regarding his ability to pay or to argue his ability to pay after the public defender had been reappointed. Consequently, the circuit court failed to fully comply with section 113-3.1 in imposing the public defender fee.

¶ 71 However, last, the State argues that defendant has forfeited this issue regarding the public defender fee because he failed to raise it in the below proceedings. The reviewing courts have repeatedly declined to apply the forfeiture rule in cases such as here where the circuit court failed to comply with the procedural requirements of section 113-3.1. See, *e.g.*, *People v. Love*, 177 Ill. 2d 550, 564 (1997) (finding application of the waiver rule inappropriate, despite the defendant not raising the issue below, because fairness dictated as much where the circuit court failed to comply with section 113-3.1). Thus, we decline to find that defendant has forfeited this issue, which we remand to the circuit court for a proper hearing on the public defender fee.

¶ 72                                   III. CONCLUSION

¶ 73 For the foregoing reasons, we affirm defendant's convictions under Counts, I, II, and IV of the amended complaint. However, we vacate defendant's conviction under Count III of the amended complaint and remand this cause to the circuit court for a proper hearing on the public defender fee.

¶ 74 Affirmed in part, vacated in part, and remanded.