NOTICE

Decision filed 12/09/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230146-U

NO. 5-23-0146

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Clark County. |
| | ) | |
| v. | ) | No. 22-CM-74 |
| | ) | |
| CHRISTOPHER A. LUTH, | ) | Honorable |
| | ) | Tracy W. Resch, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the trial court is affirmed where defendant was not denied a fair trial as the trial court's use of modified jury instructions was not in error. However, the matter is remanded to the trial court for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 2    Defendant, Christopher A. Luth, was convicted after a jury trial of one count of unlawful violation of a stalking no contact order pursuant to section 12-3.9(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.9(a) (West 2020)). Defendant was sentenced to one year of probation with conditions. Defendant appeals, arguing that the trial court erred when it submitted jury instructions that omitted an essential element, the mental state "knowingly," from the definition of

---

*Justice Barberis was originally assigned to the panel. Justice Bollinger was later substituted on the panel and has listened to oral arguments and read the briefs.

1

the offense. Further, defendant argues that the trial court failed to conduct a preliminary inquiry despite defendant's ineffective assistance of counsel assertions contained in his presentence investigation report. For the following reasons, we affirm the judgment of the trial court but remand for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 3                                I. BACKGROUND

¶ 4      On June 13, 2022, the State charged defendant with violation of a stalking no contact order (VSNCO), alleging that on June 11, 2022, defendant, having been served with notice of the contents of a stalking no contact order issued on October 13, 2021, knowingly committed an act prohibited by the stalking no contact order in that he had verbal contact with Dustin Misner, a protected person named in the stalking no contact order, in violation of section 12-3.9(a) of the Code (720 ILCS 5/12-3.9(a) (West 2020)). On September 29, 2022, the State filed an amended information charging defendant with two counts of unlawful VSNCO, alleging in count I that on June 11, 2022, defendant, having been served with notice of the contents of a stalking no contact order issued on October 13, 2021, intentionally committed an act prohibited by the stalking no contact order in that he made contact with Dustin Misner, a protected person named in the stalking no contact order, and alleging in count II that on June 11, 2022, defendant, having been served with notice of the contents of a stalking no contact order issued on October 13, 2021, intentionally committed an act prohibited by the stalking no contact order in that he was within 50 feet of Dustin Misner, a protected person named in the stalking no contact order, both in violation of section 12-3.9(a) of the Code (*id.*).

¶ 5      On September 30, 2022, the State filed a motion *in limine* to admit proof of other crimes, wrongs, or acts. A hearing was held on the motion on October 31, 2022, and the motion was ultimately denied. However, during the hearing the trial court and counsel had an extensive

discussion regarding the various legal issues involved in the matter, including the issues of the definition of "contact" and of whether defendant "knowingly" violated the stalking no contact order (SNCO). The trial court inquired whether a jury instruction conference in advance of trial could be beneficial, to which both counsel agreed. The State and defense counsel agreed there were no Illinois Pattern Jury Instructions (IPI) for the offense of VSNCO and, therefore, modified instructions would need to be utilized. The trial court set a date for an instructions conference prior to trial but stated it would not make any rulings on the instructions at that hearing. Rather, the trial court and counsel would conduct the formal jury instruction conference during the trial. Accordingly, the trial court did not think the instruction conference needed to be recorded, and counsel agreed.

¶ 6        Defendant's jury trial was held on November 15, 2022, and the State proceeded to trial only on count I of the amended information. The State informed the trial court that the parties had previously exchanged jury instructions, had spoken about them and that "I think we've got an agreement in regards to the jury instructions." The State also stated:

> "Okay, with the understanding, I believe there was some debate about the jury instruction as to the 50 feet so what we have agreed to do, there's actually a definition of contact in the Contact, No Stalking Order that we're going to include in the jury instructions. I'm going to argue he was within 50 feet. But in the context of that being contact, and additionally the State would be alleging other contact as well. But I think that clarifies what [defense counsel] is trying to say in regards to the intentionality or the knowingly having contact with Mr. Misner."

¶ 7     The State and defense counsel agreed that a record of *voir dire* was unnecessary and it was not transcribed for the record. After the State gave its opening statement, defense counsel waived his right to give an opening statement.

¶ 8     The State first called Clark County Sheriff's Deputy Keith Crouch to testify. Deputy Crouch testified that on October 14, 2021, at approximately 9:13 a.m., he personally served defendant at his residence with the SNCO issued on October 13, 2021, in Clark County case No. 2021-OP-53. Officer Crouch identified People's Exhibit A as the order listing Dustin Misner as the petitioner and defendant as the respondent. People's Exhibit A was admitted into evidence without objection.

¶ 9     Dustin Misner then testified that he lived at 1209 Ash Street in Marshall, Illinois, with his wife and youngest daughter. He had lived at that residence for a little over 20 years. Misner stated that defendant lived across the street from Misner, with Misner living on the south side of Ash Street and defendant living on the north side of the street. According to Misner, defendant has lived in his residence for about eight years. Misner testified that on September 27, 2021, he petitioned the Clark County circuit court for a SNCO against defendant. A hearing was set on the petition for October 13, 2021. Both Misner and defendant attended the hearing and provided testimony. After hearing the testimony, the circuit court granted the petition and entered a written SNCO against defendant. Misner identified People's Exhibit A as the SNCO filed on October 13, 2021, that listed Misner along with his wife and daughter as protected parties, and defendant as the respondent. The SNCO was to be in effect until October 13, 2022, and was never modified or vacated. Further, the SNCO listed Misner's address as 1209 Ash Street and defendant's address as 1302 Ash Street.

4

¶ 10    Misner then testified that the SNCO contained the condition that defendant not contact Misner in any way directly, indirectly, or through third parties, including but not limited to phone, written notes, mail, email, or fax. Further, the SNCO ordered defendant to stay at least 50 feet away from Misner and his residence. Misner testified that he had security cameras installed on his home in October 2021, after the SNCO was granted. Misner stated that one of the security cameras is pointed directly at defendant's residence at all times. Misner continued by stating that on June 11, 2022, he backed his truck out of his garage on 13th Street and proceeded northerly towards Ash Street to go to Walmart. He did not see defendant when he initially pulled out of his driveway. As he approached the stop sign on 13th Street to turn onto Ash Street, Misner saw defendant in his front yard with his dog. Misner testified that as he was pulling up to the stop sign, he made eye contact with defendant, who was also watching Misner. Misner stated that he did not speak to defendant and started to turn left onto Ash Street. As Misner was turning left, it looked like defendant was going to throw a water bottle at Misner's truck, so he was watching defendant. According to Misner, as he went around the corner, defendant threw the water bottle.

¶ 11    Misner testified that he was afraid the water bottle was going to hit his truck and he stopped his truck "just about the middle of the intersection." When asked if Misner said anything to defendant, Misner stated that he believed he asked defendant "what was that about?" According to Misner, defendant was "talking, going on about something," but Misner could not remember everything defendant was saying. He did recall defendant saying that he was not supposed to be talking to Misner. Defendant left his yard and walked to the front of Misner's truck, grabbed the water bottle, and then walked back to the truck. Misner stated that at that point, defendant stopped, turned around, and said something else before moving on. Misner thought defendant was saying something about Misner's house but could not remember all of what defendant was saying. Misner

5

never got out of his truck but testified that he told defendant that he did not "want to keep feuding." Misner stated that defendant seemed very agitated. Misner stated that defendant was probably about 10 feet from Misner during the encounter.

¶ 12    Misner testified that the encounter lasted probably less than two minutes, and defendant left the road and returned to his property. Misner then sat in the road for a few seconds and then pulled into the front of his residence and called the police. Officer Christopher McKillop arrived at his residence about 10 minutes later. Misner spoke with Officer McKillop when he arrived, and Misner informed him that he had security cameras. Misner stated that the security cameras captured video of the incident. At that point, the State admitted People's Exhibit B, the DVD of the security cameras videos, without objection. The video was published to the jury and showed defendant coming out of his residence, Misner's black truck going by, and defendant throwing the water bottle which landed in the street near Misner's truck.

¶ 13    Misner continued his testimony stating that while he and Officer McKillop were talking together in Misner's garage, defendant started walking towards them. According to Misner, defendant came out of his house and walked on 13th Street towards Misner's garage. Officer McKillop met defendant about halfway between the respective houses where defendant and Officer McKillop spoke together. Misner remained in his garage at this time but could see defendant and Officer McKillop. Misner could hear defendant and Officer McKillop talking and it appeared that defendant was "saying something my way." Misner admitted that he could not understand what defendant was saying.

¶ 14    Misner was standing in his driveway and saw Officer McKillop arrest defendant and escort him to Officer McKillop's patrol vehicle that was also located in Misner's driveway. Misner believed that as defendant was being escorted to the patrol vehicle, defendant directed comments

6

toward Misner. Misner stated there was security camera video of this incident that was also included in People's Exhibit B (this second video was not played for the jury yet). Finally, Misner testified that, at no point, did he give defendant permission to come into contact with Misner on June 11, 2022.

¶ 15     On cross-examination, Misner was questioned regarding the incident and the security camera video involving the water bottle. Misner admitted that his truck windows were down and that when defendant walked up to Misner's truck, he spoke to defendant first. At that point, defendant said something back to Misner and left. Misner was then questioned regarding the security cameras on his residence, stating that they were installed in October 2021, after the SNCO was entered, because he wanted to see defendant at all times. Misner explained that the security cameras were connected to his wife's cellular phone and would send the video to her phone, not Misner's. Misner stated that after defendant threw the water bottle, Misner called his wife to see if she could "bring up camera footage to see if it was on there." Misner's wife informed him that there was a video of the incident. This was prior to Misner contacting the police because Misner wanted to be sure there was security camera video of the incident before contacting the police.

¶ 16     Misner agreed that the security camera videos show that the encounter lasted less than two minutes. Misner further admitted that he stopped his vehicle in the roadway to engage defendant after the water bottle was thrown rather than continue driving to Walmart. Further, Misner admitted the water bottle did not hit him and that he did not drive away after defendant picked up the water bottle. Upon further questioning, Misner clarified that when Officer McKillop arrived, Misner was in the garage located behind his residence, facing 13th Street. At no time while Officer McKillop was present did Misner leave the garage. Misner agreed that he did not know what comments defendant made to Officer McKillop while they were in the roadway. Misner also

7

testified that when he approached the intersection, he saw defendant in his yard, knew defendant lived there, and that Misner was not surprised defendant was in his yard.

¶ 17    The State then called Marshall Police Department Officer Christoper McKillop to testify. Officer McKillop stated that he was dispatched to Misner's residence at approximately 12:40 p.m. on June 11, 2022. When he arrived at the residence, he parked in the driveway in front of Misner's garage off 13th Street. According to Officer McKillop, when he arrived Misner was in the garage and informed him of a complaint against defendant. Defendant was not present. Misner had security camera video of the initial incident that he showed to Officer McKillop. Officer McKillop described Misner as very upset, nervous, and shaking following the incident.

¶ 18    While Officer McKillop was speaking to Misner, he observed defendant leave his yard and begin walking towards himself and the Misner residence. Officer McKillop stopped defendant in the roadway of 13th Street. Officer McKillop and defendant began speaking and Misner remained standing just inside of his garage. According to Officer McKillop, when he stopped defendant on 13th Street, defendant was 40 feet or less from the Misner residence. As defendant was approaching Officer McKillop, defendant was talking to the officer and said: "Oh, look who it is. I bet this is what all the fuss is about. You're on duty, huh?" According to Officer McKillop, defendant began discussing the incident, then discussed the neighborhood and how there was a conspiracy against him amongst all the neighbors. At one point, defendant stepped back, looked at Misner, and started directing comments towards Misner. According to Officer McKillop, these comments were also about the neighborhood, the Misner residence, and the alleged conspiracy against defendant.

¶ 19    Officer McKillop described defendant's demeanor as very animated, moving his hands around a lot, and raising his voice. Officer McKillop stated that he was aware there was security

8

camera video that captured his interaction with defendant on 13th Street. This second video was also included in People's Exhibit B and was published to the jury with no objection. After the video was played for the jury, Officer McKillop continued, testifying that while he was interacting with Misner and defendant, he was aware of the SNCO against defendant. Officer McKillop decided to arrest defendant when he started directing comments towards Misner. Officer McKillop then escorted defendant to his patrol vehicle that was still located in Misner's driveway. Misner was present in his garage, and prior to Officer McKillop placing defendant in the patrol vehicle, defendant looked at Misner and started directing comments towards him. Officer McKillop stated that he told defendant that he needed to stop because of the SNCO and then placed defendant in the back seat of the patrol vehicle.

¶ 20 Officer McKillop testified that, while transporting defendant to jail, defendant made various derogatory comments regarding the officer and law enforcement. Also, defendant stated that the conversation between him and Misner was just a conversation and that nobody got upset about it nor resorted to vulgar language.

¶ 21 On cross-examination, Officer McKillop stated that Misner had shown him a video of the incident on Ash Street and described what he observed on the video. With regards to the incident on 13th Street, while Officer McKillop was speaking with defendant, the officer stated that he knew that it occurred 40 feet from the Misner residence. Officer McKillop explained this was an approximation, along with his later review of the "county GIS mapping," which, based on where he was standing, was approximately 38 feet from the Misner residence. When questioned further, Officer McKillop agreed that it was a "guess" about the location. Officer McKillop stated that Misner did not tell him that Misner had heard any of defendant's comments during this incident.

9

¶ 22 The State rested its case-in-chief, and defendant motioned for a directed verdict, which the trial court denied. The defense then called defendant to testify as its only witness. Defendant stated that he resided at 1302 Ash Street in Marshall, Illinois, and had lived there for eight years. Defendant was aware that the SNCO was entered in October 2021 and was in effect on June 11, 2022. According to defendant, on that date, he was in his yard with his dog so that it could go to the bathroom. While in the yard, defendant was picking up water bottles and trash that were littered from the city park next to his residence. Defendant testified that he did not recall seeing a vehicle approaching his house, stating he did not remember "seeing Mr. Misner until after the incident began." Defendant reiterated that he did not see a vehicle near his house until it had stopped outside of his home in the middle of the street.

¶ 23 When questioned about the events following the throwing of the water bottle, defendant stated that Misner remarked to him, "Hey, we are trying to be cool with you here," to which defendant responded, "I'm so sorry," and explained to Misner that he was collecting trash and water bottles that had been discarded in his yard. Defendant further indicated that Misner made another comment that was not derogatory; however, defendant was unable to recall the exact words. At that point, defendant informed Misner, "I'm not even supposed to be talking to you," and subsequently left the scene. Defendant testified that after Misner drove away, he proceeded to walk to the adjacent city park and collected trash.

¶ 24 Defendant then testified that later he looked out his front window and saw Officer McKillop in the Misners' driveway and thought that he was in trouble because his dog was off its leash. Defendant stated that Officer McKillop had been to defendant's residence before because of the dog being off its leash. According to defendant, he knew he "only had a few fleeting seconds to tell my side of the story to Officer McKillop." Therefore, defendant "did the best I could to

10

explain it from my point of view, where I was, what happened, who was involved." Defendant testified that he only spoke with Officer McKillop and never spoke with Misner. When questioned regarding what he told Officer McKillop, defendant reiterated that he was in his yard playing with his dog and picking up trash and water bottles. Defendant continued, stating that there were enough trash and water bottles that he began throwing them at his trash can to make a small pile to then later throw them all away at the same time.

¶ 25 On cross-examination, defendant agreed that the SNCO directed him not to have contact with Misner. Defendant further acknowledged the two security camera videos that were published to the jury and admitted that he spoke with Misner on June 11, 2022. When questioned that he admitted to coming within 50 feet of Misner, defendant explained that he believed he had "fair use of Ash and 13th Street" based on the judge's ruling in the SNCO because he and Misner lived next to one another. According to defendant, the judge in the SNCO case allowed defendant to use Ash and 13th Street as a "free citizen" but he could not use a nearby alleyway. When questioned regarding his coming out in the street to Misner's truck and being within 50 feet, defendant again stated his belief that he could be on Ash Street because he would need to be on it to access his home. Defendant agreed that he approached Misner's passenger side window of the truck.

¶ 26 Regarding the throwing of the water bottle, defendant stated he did not throw the bottle at Misner but rather at his own trash can. Defendant claimed the bottle was empty. Defendant explained that he was nearsighted, wore glasses, and that he "couldn't tell you one way or the other who was driving that truck unless I was probably in 15 or 20 feet of that vehicle to actually look inside to see." Defendant stated that he threw the water bottle overhand but not hard enough to leave his yard. According to defendant, the water bottle hit the trash can, hit the ground, and then

11

slid into the roadway on the ground. Defendant stated that he went into the roadway to Misner's truck to retrieve the water bottle because "he made a mistake" and "littered the road."

¶ 27 Defendant then agreed that he left his property and walked down 13th Street while Officer McKillop was talking with Misner. Defendant further testified regarding the trash from the adjacent city park and his trying to clean up the trash and water bottles. Upon further questioning, defendant admitted he was within 50 feet of Misner but reiterated that he went into the roadway to pick up the water bottle, that Misner made the initial contact asking what defendant was doing, and defendant explained that he was just picking up water bottles that he thought others from the city park were throwing at his vehicles.

¶ 28 Defendant was then asked when he learned that there was security camera video of the incident. In response, he stated that he knew he was being filmed probably two or three months prior to the incident. He stated that about that time he stopped using his outside property because he knew he was being surveilled, not only by Misner but other neighbors as well.

¶ 29 The defense rested and the State called Misner in rebuttal. Misner testified that after defendant threw the water bottle, he never apologized to Misner. On cross-examination, Misner again stated that although defendant was talking during that incident, Misner did not remember what defendant had actually said. The State rested.

¶ 30 The trial court held a jury instructions conference. Since there were no IPI instructions for the offense of violation of a stalking no contact order (720 ILCS 5/12-3.9 (West 2020)), the State tendered modified instructions modeled on the IPI instructions for the offense of violation of an order of protection (*id.* § 12-3.4). Defendant had no objection to either instruction. The modified definition instruction tendered and given stated:

"A person commits the offense of unlawful violation of a stalking no contact order when, having been served notice of the contents of a stalking no contact order, or otherwise having acquired actual knowledge of the contents of the order, he commits an act which was prohibited by a court in a stalking no contact order."

The modified issues instruction tendered and given stated:

"To sustain the charge of unlawful violation of a stalking no contact order, the State must prove the following propositions:

*First Proposition*: That the defendant had contact with Dustin Misner on or about June 11, 2022; and

*Second Proposition*: That a stalking no contact order directed that the defendant may not have contact with Dustin Misner; and

*Third Proposition*: That the stalking no contact order was in effect at the time the defendant had contact with Dustin Misner; and

*Fourth Proposition*: That at the time the defendant had contact with Dustin Misner, defendant had been served notice of the contents of the stalking no contact order or otherwise had acquired actual knowledge of the contents of the order.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

13

¶ 31    The State and defense counsel presented closing arguments. The State informed the jury of the four elements necessary to prove a violation of the stalking no contact order. The State then reiterated the testimony and evidence presented as they related to each element. The State argued that as of June 11, 2022, the date of the incident, defendant admitted that he had been served with and had knowledge of the contents of the SNCO. The State argued that the SNCO was in effect on June 11, 2022, and that it directed that defendant not have any contact with Misner. The State further argued that since defendant had been served with the SNCO, he acquired knowledge that he was prohibited from having contact with Misner. The State argued that the evidence in the case showed that defendant had qualifying "contact" with Misner that was prohibited under the SNCO. The State specifically referenced the security camera video showing defendant throwing the water bottle at Misner's truck, approaching the truck, and then speaking with Misner. The State also referenced the second security camera video showing defendant approaching Misner and his residence as he was speaking with Officer McKillop. Further, the State referenced the testimony of Officer McKillop that defendant directed comments towards Misner while he and Officer McKillop spoke on the roadway and then again when defendant was being escorted to the officer's patrol vehicle. Lastly, the State referenced Officer McKillop's testimony that defendant admitted speaking with Misner, as well as defendant's own admission during the trial that he had contact with Misner on June 11, 2022.

¶ 32    Defendant began his closing argument referencing the benefits of having the security camera videos in this particular case. Defendant reiterated that the SNCO prohibited defendant from having any contact whatsoever with Misner. Defendant argued that in this case, defendant and Misner lived across the street from each other which made it impossible for them to not have any contact whatsoever with each other. Defendant turned to the first security camera video

14

regarding the incident with the water bottle. Defendant acknowledged that the route taken by Misner was the direct route to travel to Walmart; however, defendant argued that Misner did not have to take that route. Rather, argued defendant, Misner could have gone the other direction but instead went directly towards defendant's residence. Defendant then argued that defendant's throwing of the water bottle was not an unlawful initiation of the contact, but rather, it was Misner who initiated the contact by stopping in the roadway after the water bottle was thrown. Defendant argued that it was Misner who stopped his truck, engaged defendant, and spoke with defendant. Defendant argued that, at that point, Misner could have driven off and left the scene without any interaction. Further, defendant argued that rather than leaving the scene, Misner confirmed the incident was captured via the security cameras and contacted the police.

¶ 33   Moving to the security camera video of defendant's later interaction with Officer McKillop and Misner, defendant argued that he was merely engaging the officer. Defendant acknowledged that defendant made comments to Officer McKillop regarding Misner; however, Misner's testimony was that he did not hear what defendant was saying about Misner. Accordingly, defendant argued that the comments he directed at Misner were not communicated successfully.

¶ 34   In rebuttal, the State argued that the initial contact in the case began by defendant throwing the water bottle at Misner's truck, rather than Misner's stopping his truck and asking defendant a question. The State argued that Misner's question was a response to the throwing of the water bottle by defendant. Further, the State argued that, regarding the circumstances, Misner acted appropriately by contacting the police. The State again turned to the second incident where defendant approached Misner and his residence without a valid reason. The State argued that the SNCO prohibited defendant from having contact with Misner, not Misner having no contact with defendant. Turning to defendant's argument regarding defendant's comments directed towards

15

Misner, the State argued that it did not matter that Misner could not hear what defendant's comments were. Rather, the State argued that Misner believed the comments were directed towards him and that was sufficient contact that was prohibited by the SNCO.

¶ 35    During its deliberations the jury asked the trial court, "If the victim starts a contact by stopping and the guys [*sic*], then talks to him, is that in violation of no contact since the victim stopped and contacted him at his house?" By agreement of counsel, the trial court responded, "You have the law as stated in the jury instructions. It is your duty to render a verdict based on the law and evidence." After 48 minutes of deliberation, the jury found defendant guilty of the offense of VSNCO.

¶ 36    The trial court ordered the probation office to prepare a presentence investigation (PSI) report and a psychological report. In the interview included within the PSI, defendant made various claims regarding the representation of defense counsel. He claimed that his attorney did not do anything for him and that he never met with him prior to court. He indicated that his attorney did not want to fight for him and told him to take a plea agreement. The PSI that contained defendant's allegations against defense counsel was filed on December 21, 2022.

¶ 37    The trial court conducted a sentencing hearing on January 30, 2023, took the matter under advisement, and reset the matter. On March 6, 2023, the matter reconvened and the trial court sentenced defendant to one year of probation with various terms and conditions. The trial court did not inquire regarding defendant's allegations against trial counsel at either hearing. Defendant did not file any posttrial motions. A timely notice of appeal was filed on March 7, 2023. This appeal followed.

II. ANALYSIS

¶ 39    Defendant raises two issues on appeal. Defendant argues that the trial court erred in that:

(1) the State's modified IPI 11.77 and 11.78 were given in error and (2) the trial court erred in not

conducting an initial *Krankel* inquiry regarding his allegations of ineffective assistance of trial

counsel contained in the PSI. For the following reasons, we affirm the conviction but remand for

the limited purpose of a *Krankel* hearing.

¶ 40                                  A. Jury Instructions

¶ 41    Defendant was charged with the offense of VSNCO, which states in part:

   "(a) A person commits violation of a stalking no contact order if:

        (1) he or she *knowingly* commits an act which was prohibited by a court or fails to

commit an act which was ordered by a court in violation of:

            (A) a remedy in a valid stalking no contact order of protection ***."

   (Emphasis added.) 720 ILCS 5/12-3.9(a)(1)(A) (West 2020).

¶ 42    Similarly, the violation of an order or protection statute (VOP) states in part:

   "(a) A person commits violation of an order of protection if:

        (1) He or she *knowingly* commits an act which was prohibited by a court or fails to

Commit an act which was ordered by a court in violation of:

            (i) a remedy in a valid order of protection ***." (Emphasis added.) *Id.* § 12-

        3.4(a)(1)(i).

¶ 43    Because no IPI was available for VSNCO, the parties agreed to utilize a modified version

of the IPIs for VOPs. More specifically, the IPI for VOP reads:

   "A person commits the offense of violation of an order of protection when, having

been served notice of the contents of an order of protection, or otherwise having acquired

17

actual knowledge of the contents of the order, he commits an act which was prohibited by a court in an order of protection." Illinois Pattern Jury Instructions, Criminal, No. 11.77 (approved Dec. 8, 2011) (hereinafter IPI 11.77).

¶ 44    In this matter, the parties agreed to the following modification of IPI 11.77:

"A person commits the offense of unlawful violation of a stalking no contact order when, having been served notice of the contents of a stalking no contact order, or otherwise having acquired actual knowledge of the contents of the order, he commits an act which was prohibited by a court in a stalking no contact order."

The term "knowingly" is not included in the first line of either instruction. More specifically, neither mirror their respective statutes to read "a person *knowingly* commits ***."

¶ 45    Illinois Pattern Jury Instructions, Criminal, No. 11.78 (approved Dec. 8, 2011) (hereinafter IPI 11.78), states in part:

"To sustain the charge of violation of an order of protection, the State must prove the following propositions:

*First Proposition*: That the defendant _____ ; and

*Second Proposition*: That an order of protection prohibited the defendant from performing [(that act) (those acts)];

[(or)]

*Second Proposition*: That an order of protection directed the defendant to perform [(that act) (those acts)];

and

*Third Proposition*: That the order of protection was in effect at the time the defendant _____; and

18

*Fourth Proposition*: That at the time the defendant _____, he had been served notice of the contents of an order of protection or otherwise had acquired actual knowledge of the contents of the order."

¶ 46 The modified issues instruction tendered and given stated in part:

"To sustain the charge of unlawful violation of a stalking no contact order, the State must prove the following propositions:

*First Proposition*: That the defendant had contact with Dustin Misner on or about June 11, 2022; and

*Second Proposition*: That a stalking no contact order directed that the defendant may not have contact with Dustin Misner; and

*Third Proposition*: That the stalking no contact order was in effect at the time the defendant had contact with Dustin Misner; and

*Fourth Proposition*: That at the time the defendant had contact with Dustin Misner, defendant had been served notice of the contents of the stalking no contact order or otherwise had acquired actual knowledge of the contents of the order."

The term "knowingly" is not included in either instruction in the first proposition. More specifically, neither read "the defendant knowingly ***." For both IPI 11.77 and 11.78, the only modification made for use in this matter was the substitution of "an order or protection" with "a stalking no contact order."

¶ 47 Defendant argues that the trial court violated his constitutional rights to due process and a jury trial by omitting the term "knowingly" from the modified IPI instructions which did not align with the definition used in the VSNCO statute. He contends that the omission of "knowingly" effectively converted the VSNCO into an absolute liability offense. Defendant admits that defense

counsel did not object to the use of the modified IPIs nor did he raise it in a posttrial motion. He maintains, however, that the issue can still be reviewed under both prongs of the plain error doctrine. He asserts that an analysis under both prongs leads to a conclusion that error occurred. Finally, defendant argues that he was deprived of the effective assistance of counsel when trial counsel agreed to the modified IPIs and failed to raise the issue in a posttrial motion.

¶ 48    In response, the State first argues that defendant cannot complain of the omission of "knowingly" as it was invited error. It maintains that defendant cannot appeal the issue because trial counsel agreed to the use of the modified IPIs that did not include the term "knowingly." The State further contends that the complained-of error, since it was invited, cannot be subjected to a plain error analysis. The State further asserts that the modified IPI instructions correctly stated the law and, thus, their use was not an abuse of discretion. If we consider the issue under the plain error doctrine, the State argues that because there was no error, there can be no plain error. In any event, the State asserts, the omission does not satisfy either prong of the plain error doctrine. Finally, the State contends that counsel was not ineffective because the choice of jury instructions is a matter of trial strategy. It argues that defense counsel's agreement to the modified IPIs was a "thorough and well thought-out decision" and a "clear matter of strategy." The State maintains that defendant cannot prove both elements required in *Strickland*.

¶ 49    "[J]ury instructions 'provide the jury with correct legal principles that apply to the evidence, thus enabling the jury to reach a proper conclusion based on the applicable law and the evidence presented.' " *People v. Fane*, 2021 IL 126715, ¶ 34 (quoting *People v. Parker*, 223 Ill. 2d 494, 500 (2006)). In this matter, we are asked to determine whether the tendered jury instructions accurately conveyed the law. "Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury instructions accurately

20

conveyed to the jury the law applicable to the case, our review is *de novo*." *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 50                                                    1. *Invited Error*

¶ 51    The State first contends that defendant is estopped from arguing that it was error for the trial court to omit the term "knowingly" from the jury instructions because defense counsel agreed to the proposed instructions, citing the invited error doctrine. Defendant disagrees, asserting that defense counsel did not invite the error as he was not the one who tendered the modified IPIs or "affirmatively acquiesce to the flawed instructions." Rather, argues defendant, the instructions were offered by the State and defense counsel did not object.

¶ 52    The doctrine of invited error "provides that a party may not request the court to proceed in one manner and then argue on appeal that the requested action was error." *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24. We agree with defendant that the invited error doctrine is inapplicable to the case at bar. The State, not defendant, tendered the modified IPI. See *People v. Coan*, 2016 IL App (2d) 151036, ¶ 24 (where defendant did not invite error because he did not tender the instruction nor because he did not object). Further, "[w]e reject the State's suggestion that, because defendant did not object to the instruction, he 'agreed on the record to use the instruction.' " *Id*. Consequently, we determine that the invited error doctrine is inapplicable to facts of the present case and thus proceed to an analysis of the issues raised.

¶ 53                                                    2. *Plain Error*

¶ 54    "[W]e will review unpreserved jury instruction errors pursuant to Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), which provides that 'substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require.' 'Rule 451(c) is coextensive with the "plain error" clause of Supreme Court Rule 615(a), and we construe

21

these rules "identically." ' " *People v. Hartfield*, 2022 IL 126729, ¶ 49 (quoting *People v. Herron*, 215 Ill. 2d 167, 175 (2005)). Illinois Supreme Court Rule 615(a) sets out the plain error rule as follows: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). " '[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *In re N.H.*, 2016 IL App (1st) 152504, ¶ 75 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). "The first step of any plain error review is to determine whether any error occurred at all." *In re N.H.*, 2016 IL App (1st) 152504, ¶ 76. We first address second prong plain error.

¶ 55                             a. Second Prong Plain Error

¶ 56    Defendant contends that the tendering of the modified IPIs without including the term "knowingly" amounted to a second prong plain error. Under the second prong of plain error review, "the defendant must prove that there was plain error and that 'the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' " *People v. Johnson*, 2021 IL App (1st) 190567, ¶ 13 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). This type of error is generally referred to as a structural error. *People v. Ratliff*, 2024 IL 129356, ¶ 37. "A structural error is one that " 'necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence.' " *Id.* (quoting *People v.*

22

*Glasper*, 234 Ill. 2d 173, 197-98 (2009)). "The second prong of the plain-error rule is 'invoked only in those exceptional circumstances where, despite the absence of objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process.' " *People v. Artis*, 232 Ill. 2d 156, 166 (2009) (quoting *People v. Harvey*, 211 Ill. 2d 368, 387 (2004)). The Supreme Court has recognized errors as " 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' " *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Johnson v. United States*, 520 U.S. 461, 468-69 (1997)); see *Gideon v. Wainwright*, 372 U.S. 335 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (biased trial judge financially benefitted from conviction); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39 (1984) (denial of public trial). "Those errors deprive defendants of basic protections, such that their trials are not a reliable vehicle for determining guilt." *Ratliff*, 2024 IL 129356, ¶ 38. The question in this matter is whether the use of the modified IPIs without including the term "knowingly" is a "violation akin to structural error, so it may be reviewed as second-prong plain error, or is it akin to trial error, so it is subject to harmless error analysis and may be reviewed only as first-prong plain error." *Id.* ¶ 43.

¶ 57   In *Sullivan v. Louisiana*, 508 U.S. 275 (1993), the issue on appeal was whether a "constitutionally deficient reasonable-doubt instruction may be harmless error." *Id.* at 276. In its analysis, the Supreme Court considered whether a jury instruction issue is automatically a structural error requiring reversal or whether a harmless-error-type analysis would suffice. With regard to the jury instruction it was analyzing, it stated:

>          "Insofar as the possibility of harmless-error review is concerned, the jury-
> instruction error in this case is quite different from the jury-instruction error of erecting a

23

presumption regarding an element of the offense. A mandatory presumption—for example, the presumption that a person intends the ordinary consequences of his voluntary acts—violates the Fourteenth Amendment, because it may relieve the State of its burden of proving all elements of the offense. [Citations.] But '[w]hen a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt.' [Citation.] And when the latter facts 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed.' [Citations.] A reviewing court may thus be able to conclude that the presumption played no significant role in the finding of guilt beyond a reasonable doubt. [Citation.] But the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings." (Emphasis in original.) *Id.* at 280-81.

¶ 58      The same analysis applies in the case at bar. The actions on the part of defendant—throwing the water bottle, speaking to Misner, and approaching Misner's home—were done intentionally and knowingly. No rational jury could find that defendant did all of these actions without knowing he was doing them. As a result, these predicate facts, which are closely related to knowingly committing a violation, leads to a determination that this presumption of knowledge "played no significant role in the finding of guilt beyond a reasonable doubt." *Id.* at 281. As a result, the use of the IPIs in this matter, without including the term "knowingly," does not amount to structural error, and thus no second prong plain error exists.

24

¶ 59                            b. First Prong Plain Error

¶ 60    In addition to second prong plain error, defendant asserts that first prong plain error is present. We begin our analysis of first prong plain error by a review of caselaw that addressed similar situations. In *People v. Hoffman*, 2012 IL App (2d) 110462, the defendant was charged with violating an order of protection. During the jury instruction conference, the State tendered IPI 11.77 and 11.78. *Id.* ¶¶ 5, 7. The defendant tendered an alternative to the instructions which included language that the offense of violating an order of protection is not a strict liability offense and that the State was required to prove a "guilty act" and a "guilty mind." *Id.* ¶ 6. Over the defendant's objection, the trial court determined that the State's jury instruction should be given. *Id.* ¶ 7. The defendant was convicted and appealed. *Id.* ¶ 1. The issue on appeal was whether the trial court erred in not tendering the defendant's non-IPI jury instruction. *Id.* ¶ 8.

¶ 61    The appellate court noted that "in order to prove a defendant guilty of violating an order of protection, the State must prove both the voluntary act and the appropriate mental state." *Id.* ¶ 12. The court found, however, that the tendered IPI instructions did properly instruct the jury with the mental state necessary to find the defendant guilty of violating the order of protection. *Id.* The order of protection statute in effect at the time stated in part "that a defendant violates an order of protection when '[the] defendant (1) committed an act prohibited by an order of protection, or failed to commit an act ordered by an order of protection, and (2) he had been served notice of or otherwise acquired *actual knowledge* of the contents of the order.' " (Emphasis in original.) *Id.* ¶ 13 (quoting *People v. Mandic*, 325 Ill. App. 3d 544, 547 (2001), citing 720 ILCS 5/12-30(a) (West 2000)). The court noted that the tendered instructions were in line with the statute, as when read together, they "advised the jury that, in order to find defendant guilty of violating the order of protection, the jury had to find that defendant was given notice of or otherwise had actual

25

knowledge of the contents of the order of protection, that the order of protection prohibited defendant from contacting [victim], that defendant contacted [victim], and that the order of protection was in effect when defendant contacted [victim]." *Id.* ¶ 14. The court concluded that "[w]hen a defendant has knowledge of the contents of an order of protection, it necessarily follows that, when he does some act in contravention of the terms of the order of protection, he does so with knowledge that those acts are prohibited." *Id.* ¶ 15. The court found that the tendered instructions correctly stated the law and found that the trial court did not abuse its discretion when it refused to tender the defendant's non-IPI instruction. *Id.* ¶ 16.

¶ 62    Subsequent to that case, the VOP statute was amended in 2019 to add that the person had to knowingly commit a prohibited act, in addition to having had actual knowledge of the contents of the order of protection. IPI 11.77 and 11.78 were never modified to add the term "knowingly."

¶ 63    In *People v. Barwicki*, 2024 IL App (2d) 230285-U, the defendant appealed his conviction for violating an order of protection. One of the arguments on appeal pertained to the IPI instructions for VOPs and the fact that they do not contain the term "knowingly." *Id.* ¶ 20. The appellate court found that while "it was arguably error to submit instructions that did not contain both elements," it did not amount to plain error. *Id.* ¶¶ 22-23. For that reason, and for reasons unrelated to the case at bar, the appellate court affirmed the judgment.

¶ 64    In *People v. Gupta*, 2024 IL App (3d) 220349-U, the defendant was convicted of violating a stalking no contact order. The jury instructions given by the trial court were modeled after IPI 11.77 and 11.78 and did not include the term "knowingly" before describing the act that defendant allegedly committed. *Id.* ¶ 22. On appeal defendant argued that the trial court erred by tendering jury instructions that inaccurately conveyed the law, which were admitted over the defendant's objection. *Id.* ¶¶ 45, 47. The appellate court discussed *Hoffman* and noted that it predated the

26

amendment to the VOP statute. *Id.* ¶ 53. The appellate court found that the trial court "erred by submitting written instructions that did not require the jury to find that defendant knowingly violated the Order to convict him." *Id.* The court proceeded with a harmless error analysis and ultimately determined that sufficient evidence was presented "for the jury to have found that defendant knowingly" violated the terms of the order of protection, stating "when a defendant has knowledge of the contents of an order or [*sic*] protection, it necessarily follows that any contravention of the order is done while knowing that the act was prohibited." *Id.* ¶¶ 64, 62. For that reason, as well as others unrelated to the present matter, the appellate court affirmed the judgment.[1] *Id.* ¶ 73.

¶ 65    Finally, in *People v. Gittings*, 2025 IL App (4th) 241445, the defendant appealed his conviction for violating an order of protection, arguing that his counsel was ineffective for tendering IPI 11.77 and 11.78 because they did not accurately reflect the law. *Id.* ¶ 43. Defense counsel had tendered IPI 11.77 and 11.78 without objection by the State. *Id.* ¶¶ 32, 33. One of the issues on appeal was the use of the tendered instructions in light of the amended language of the order of protection statute. *Id.* ¶ 64. Defendant argued that neither instruction "accurately reflects the law, which requires the State to prove that, in addition to his knowledge of the restrictions imposed by the order of protection, defendant *knowingly committed* the acts alleged to have violated the order." (Emphasis in original.) *Id.* The appellate court agreed, stating that while IPI 11.77 instructs the jury regarding the required knowledge of the restrictions imposed, it does not include "the mental state component" with regard to the conduct that constitutes a violation. *Id.* ¶ 71. The court noted that IPI 11.78 is flawed in the same respect. *Id.* ¶ 72. In other words, while

_____

[1]The appellate court vacated the judgment on one count due to violation of the one-act, one-crime doctrine.

the statute "has two distinct knowledge components (knowledge of the order and knowingly acting in violation of it), the IPI instructions instruct on only one." *Id.* ¶ 73. The court found that IPI 11.77 and 11.78 inaccurately state the law by not containing the term "knowingly." *Id.* It pointed out that the statute is not a strict liability statute and that "[t]he jury must be instructed that a defendant violated the order [of] protection *knowing* that he or she was doing so." (Emphasis in original.) *Id.*

¶ 66 The court discussed *Hoffman* and noted that it predated the 2019 amendment to the VOP statute. *Id.* ¶ 75. It concluded that IPI 11.77 and 11.78 "do not accurately convey the present law regarding the charge of violation of an order of protection" and urged the Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases to consider updating IPI 11.77 and 11.78. *Id.* ¶ 76. Despite the foregoing, the appellate court affirmed the judgment, finding that no prejudice for ineffective assistance of counsel purposes resulted from the "tendering of the jury instructions that did not explicitly state the knowledge requirement with respect to his conduct." *Id.* ¶ 88.

¶ 67 While the preceding cases offer guidance in our analysis of the facts in the present matter, we find it significant that they all, with the exception of *Hoffman*, were decided after the trial in this matter. Of further note, in 2019, the VOP statute was amended and now emulates VSNCO in terms of mental state; however, the IPIs for the newly amended VOP remains unchanged. Specifically, the term "knowingly" was not incorporated to align with the addition of "knowingly" in the VOP statute. These were the IPIs used by the trial court in modified form. Defendant does not contend that it was an error to utilize and modify the VOP IPIs for VSNCO. Instead, he argues that it was an error to omit "the mental state of 'knowingly' " from the instructions. For the following reasons, we disagree.

28

¶ 68    First, we point out that the term "knowingly" was not "omitted" from the modified IPIs used in this matter, as defendant repeatedly claims. Something is omitted when, either by neglect or deliberately, it has been left out. The Law Dictionary. "Knowingly" was not a part of IPI 11.77 or 11.78, and therefore, it could never have been negligently or purposefully left out. Characterizing the drafting of the modified IPI instructions in this matter to not include "knowingly" as an omission infers that "knowingly" was always to be included, which is incorrect. In any event, we will continue to use the term employed by defendant in our analysis for sake of simplicity.

¶ 69    Second, as mentioned previously, the foregoing case authority holding that the term "knowingly" should be included in IPI 11.77 and 11.78 arose subsequent to the trial of this matter. Consequently, neither defense counsel nor the trial court was apprised of any case authority holding in this manner. In other words, it is reasonable for the State, defense counsel, and the trial court to have relied on the correctness of the IPIs and the case authority applicable at the time, *i.e.*, *Hoffman*, which held that the IPIs properly instructed the jury. Additionally, *Gittings*, which was decided three years after the trial in this matter, and which defendant strongly relies on, is distinguishable from the present case. First and foremost, the defendant tendered the jury instructions in that matter whereas here, the State tendered the instructions. Further, the appellate court concluded that *Barwicki*, although an unpublished order, "should have put counsel on notice that the two instructions at issue did not accurately reflect current law" and, "[g]iven the state of the law at the time of trial, *** trial counsel's tender of the two instructions was objectively unreasonable." *Gittings*, 2025 IL App (4th) 241445, ¶ 79. Here, as mentioned previously, defense counsel, at the time of trial, only had *Hoffman* to rely on which held that the jury instructions

29

"correctly state the law applicable to a violation of an order of protection." *Hoffman*, 2012 IL App (2d) 110462, ¶ 16.

¶ 70 Third, at the time of the trial in this matter, the VOP statute and the VSNCO statute were aligned in incorporating the term "knowingly." Consequently, the omission of the term "knowingly" in IPI 11.77 and 11.78 as well as the instructions given by the trial court patterned after those IPIs applicable to VOPs does not warrant questioning. IPI 11.77 and 11.78 have been in existence both prior to and since the amendments to the VOP statute in 2019, and reliance upon it was both reasonable and justified.

¶ 71 Finally, the IPIs do instruct the jury that defendant must knowingly commit a violation. As articulated in *Hoffman*, "[w]hen a defendant has knowledge of the contents of an order of protection, it necessarily follows that, when he does some act in contravention of the terms of the order of protection, he does so with the knowledge that those acts are prohibited." *Hoffman*, 2012 IL App (2d) 110462, ¶ 15. "A person acts 'knowingly when he is consciously aware that his conduct is practically certain to cause the result' ***." *People v. Dorsey*, 2016 IL App (4th) 140734, ¶ 34 (quoting *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992)). Intent is seldom proven through direct evidence, as it pertains to mental state. *Id.* "Instead, it may be proven by circumstantial evidence, in that it may be inferred from surrounding circumstances and the character of the defendant's acts." *Id.* Essentially, we can infer that defendant was aware that his actions were prohibited, given his knowledge of the terms of the SNCO, and therefore actively engaging in conduct contrary to those terms indicates a knowing violation of the law.

¶ 72 The State provided the instructions in this matter, which defendant did not contest. The instructions utilized in this case mirrored those for VOPs, as the VOP statute aligns with the VSNCO statute. The instructions for VOPs remained unchanged even after the VOP statute was

amended in 2019. The cases that arose after *Hoffman* support the principle that the term "knowingly" should be incorporated into IPI 11.77 and 11.78. While we acknowledge the foregoing post-*Hoffman* cases stand for the proposition that the term "knowingly" should be included in IPI 11.77 and 11.78, given all the other considerations mentioned above, we find that the modification of the instructions in this particular matter does not amount to error.

¶ 73　　Nevertheless, assuming *arguendo* that we did find error, we do not conclude that defendant was prejudiced. Under the first prong of plain error, defendant must demonstrate that "there was plain error and that 'the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him.' " *Johnson*, 2021 IL App (1st) 190567, ¶ 13 (quoting *Herron*, 215 Ill. 2d at 187). Defendant asserts that the evidence was so closely balanced, given that the parties were neighbors and that accidental contact was probable. He further observes that the jury asked whether it constituted a violation, considering that Misner was the one who stopped and communicated with defendant. This suggests, according to defendant, that the evidence was closely balanced. We disagree with defendant on both points.

¶ 74　　First, defendant contends that his belief in his lawful use of the street where the parties reside, as well as his perception of such use, supports the assertion that the evidence was evenly balanced. However, the lawful utilization of a street, such as driving through to arrive at a destination, fundamentally differs from throwing plastic at a vehicle or directing words toward a protected party. Defendant is undoubtedly permitted to use the street for driving purposes. In fact, he testified that the trial court in the SNCO matter "allowed me to use Ash Street and 13th Street as a free citizen but he denied me the use of the alleyway that connected, that ran in between Ash and Beech Streets." Given these parameters, however, defendant cannot interpret the use allowed as justification for his actions in this particular case.

31

¶ 75    Second, the evidence presented was not evenly balanced and was unfavorable to defendant. The amended information alleged that defendant violated the SNCO by making contact with Misner. The evidence presented indicated there were multiple instances where defendant made contact with Misner, including throwing a water bottle at Misner's vehicle, approaching the vehicle, and engaging in a discussion with him. Furthermore, after Officer McKillop arrived, defendant proceeded towards Misner's residence and was subsequently stopped by Officer McKillop. Officer McKillop testified that defendant had spoken words towards Misner and was ultimately arrested for such conduct.

¶ 76    Defendant also acknowledged during the trial that he engaged in conversation with Misner. He testified that after throwing the water bottle, he apologized to Misner and subsequently explained to Misner the reason for collecting trash from his yard. He recognized that he was instructed to have no contact with Misner and, during cross-examination, admitted that he did speak to Misner.

¶ 77    In addition to testimonial evidence, the jury was provided with video evidence supporting multiple contacts by defendant with Misner in violation of the SNCO. The video illustrates defendant retrieving a water bottle from his front yard, and as Misner was executing a left turn in front of defendant's residence, defendant throws the water bottle towards his trash can and Misner's truck. Misner halts, and defendant proceeds into the street to pick up the water bottle, subsequently approaching the passenger side door of Misner's truck. There is ongoing conversation as defendant, while walking away, continues to turn towards Misner's truck and gestures with his arms as if engaged in a dialogue.

¶ 78    The second video depicts defendant walking down the street towards Misner's residence, where Officer McKillop encounters him in the street. They engage in a conversation, and

immediately before his arrest, defendant turns his body and extends his arm as if speaking to an unseen individual. Defendant was arrested at that juncture. Officer McKillop testified that the decision to arrest defendant was made when defendant began directing comments towards Misner. Both the testimonial and video evidence establish that defendant violated the terms of the SNCO through at least four actions, thereby providing the jury with substantial evidence that defendant violated the SNCO. The jury arrived at its verdict after only 48 minutes of deliberation. The lack of "knowingly" in the jury instruction does not alter or diminish the overwhelming evidence that defendant had multiple contacts with Misner.

¶ 79    Third, defendant asserts that the jury's question indicates that the jury was "grappl[ing] with whether [defendant] knowingly violated the order." More specifically, the jury asked, "If the victim starts a contact by stopping and the guys [*sic*], then talks to him, is that in violation of no contact since the victim stopped and contacted him at his house?" However, inquiring whether it constitutes a violation when a victim initiates contact is not equivalent to asking whether it is a violation if defendant was unaware that his actions were violating the SNCO. The jury was not scrutinizing defendant's awareness of the unlawfulness of throwing the water bottle or speaking with Misner on at least three separate occasions. Rather, the jury was examining Misner's actions from the standpoint of who initiated the first contact.

¶ 80    Finally, and most notably, defendant admitted that he informed Misner that he was not supposed to be communicating with him. Misner testified that immediately following the incident when defendant threw the water bottle, defendant told him that he was not supposed to be speaking to him. Subsequently, when describing the interaction with Misner after the water bottle was thrown, defendant testified that he told Misner, "I'm not even supposed to be talking to you."

33

¶ 81    Defendant contends that this case involved a credibility contest between the parties and that, therefore, the jury instruction was the tipping point. A "credibility contest" exists when the evidence in a case boils down to the testimony of witnesses presenting alternative versions of the events, and no additional evidence is introduced to contradict or corroborate either version of events. *People v. Naylor*, 229 Ill. 2d 584, 608-09 (2008). However, a "credibility contest" does not apply in this case in light of the corroborating video evidence and both Misner and defendant's testimony that defendant admitted to Misner that he should not be engaging with him. Defendant's admission, both to Misner on the day of the incident and during the trial, clearly indicates that he "knowingly" committed an act in violation of the SNCO.

¶ 82    "Under the first prong of plain-error analysis, '[w]hat makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive.' *** 'The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced.' " *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 71 (quoting *People v. Sebby*, 2017 IL 119445, ¶¶ 68-69). Based on all the aforementioned overwhelming evidence of defendant's actions in violation of the SNCO, we find that defendant has not met his burden of establishing that the evidence was closely balanced, and consequently, defendant has not met his burden of proving plain error under the first prong.

¶ 83                    B. Ineffective Assistance of Counsel

¶ 84    Defendant next asserts that he was deprived of the effective assistance of counsel because defense counsel acquiesced to the use of the jury instructions, failed to request appropriate instructions, and failed to raise the issue in a posttrial motion. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

34

*Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* at 687. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688.

¶ 85    "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way." *Id.* "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *** Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92.

¶ 86    "Even if a defendant shows that particular errors of counsel were unreasonable, *** the defendant must show that they actually had an adverse effect on the defense." *Id.* at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695. "Whether counsel provided ineffective assistance is a mixed question of fact and law." *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). "[Reviewing courts] defer to the trial court's findings of fact, but [they] make an independent judgment about the ultimate legal issue." *Id.*

¶ 87    Defendant contends that "[o]bjectively reasonable counsel would have ensured that the jury was provided with the proper IPIs that reflected each element of the crime charged." We generally concur with this assertion but also find that defense counsel indeed fulfilled this obligation. As previously stated, the IPIs employed in this case were adapted from those used for VOPs. The IPIs relevant to the VOP statute does not incorporate the term "knowingly." The VOP statute parallels the SNCO statute. An objectively reasonable attorney would, upon comparing the two statutes, recognize that they are identical with respect to the mental state. Given their similar nature, it logically follows that the IPIs utilized for VOPs would also apply to VSNCOs.

¶ 88    Furthermore, the case law discussed above were decided after the trial in question. Therefore, no argument can be made that defense counsel should have been put on notice of any case authority holding that the term "knowingly" should be included in either the VOP or VSNCO instructions. As discussed previously, *Gittings*, which was cited by defendant in his supplemental brief, is distinguishable.

¶ 89    Additionally, defense counsel acknowledged that there were no IPIs for VSNCOs and that a modified one would be used. The trial court even scheduled a special setting to discuss the issue of jury instructions prior to the commencement of the jury trial. We were not provided with a

transcript of that instruction conference, but on the date of trial, the State withdrew the second count, stating in part:

> "Okay, with the understanding, I believe there was some debate about the jury instruction as to the 50 feet so what we have agreed to do, there's actually a definition of contact in the Contact, No Stalking Order that we're going to include in the jury instructions. I'm going to argue he was within 50 feet. But in the context of that being contact, and additionally the State would be alleging other contact as well. But I think that clarifies what [defense counsel] is trying to say in regards to the intentionality or the knowingly having contact with Mr. Misner."

The State acknowledged that defense counsel was concerned with instructing the jury that defendant had to knowingly have contact with Misner, and the parties rectified it by modifying some of the jury instructions, including the one that defined "contact." "Generally, counsel's choice of what jury instructions to tender to the court is a matter of trial strategy." *People v. Bruemmer*, 2021 IL App (4th) 190877, ¶ 53.

¶ 90    Finally, since an objectively reasonable attorney would have relied upon IPI jury instructions, it follows that they would not have objected to or raised the issue in a posttrial motion. As a result, we conclude that defense counsel's representation was not deficient; therefore, defendant's claim of ineffective assistance of counsel fails.

¶ 91                                    C. *Krankel*

¶ 92    Defendant next argues, and the State concurs, that this matter should be remanded for a *Krankel* hearing. He contends that during the PSI interview, he complained that defense counsel was not defending him. More specifically, he stated:

"My court appointed attorney didn't do anything for me. I never met with him prior to court. He worked with [the State] at the jury trial. Once there was video evidence my attorney claimed I was guilty and the video is only about a minute long. Once it was presented to [defense counsel] there was no fighting anything. It was take a plea agreement or nothing at that point."

¶ 93    When a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel, Illinois courts follow the common-law procedure as it has evolved from *Krankel*. *People v. Ayres*, 2017 IL 120071, ¶ 11. More specifically, when a defendant raises a claim of ineffective assistance of counsel, the trial court should examine the factual basis of the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.* at 78.

¶ 94    Here, defendant expressed concerns to the probation officer during his PSI interview, who subsequently documented defendant's assertions and incorporated them into the PSI report. " '[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention' [citations], and thus, a defendant is not required to file a written motion [citation] but may raise the issue orally [citation] or through a letter or note to the court [citation]." *Ayres*, 2017 IL 120071, ¶ 11 (quoting *Moore*, 207 Ill. 2d at 79). After the filing of the PSI, the matter was scheduled for two court appearances. At the final court appearance before pronouncing the sentence, the trial court stated that it had reviewed the PSI but made no remark regarding defendant's complaints concerning defense counsel and did not conduct any inquiry. Some interchange between the trial court and counsel regarding the facts and circumstances concerning

38

the claims of ineffective assistance is usually necessary. *Moore*, 207 Ill. 2d at 78. Additionally, it is common for a discussion to occur between the trial court and the defendant regarding the claims. *Id.* "[T]he inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Ayres*, 2017 IL 120071, ¶ 21. Here, no posttrial discussion was had with defendant regarding his allegations.

¶ 95    While defendant did not explicitly use the phrase "ineffective assistance of counsel" in his communications with the interviewer, the allegations presented were sufficient to warrant an inquiry under *Krankel*. A defendant is not required to file a specific motion; a letter or note directed to the court is adequate. *Id.* ¶ 11. Defendant's statements during the PSI interview included multiple allegations against his attorney, which were incorporated into the PSI report and submitted to the court. " 'Given that the court read the allegations of ineffectiveness, which were made by defendant to a court employee for inclusion in a report prepared specifically for the court, an inquiry under *Krankel* was warranted.' " *In re Johnathan T.*, 2022 IL 127222, ¶ 50 (quoting *People v. Craig*, 2020 IL App (2d) 170679, ¶ 18); see *People v. Sherman*, 2020 IL App (1st) 172162, ¶¶ 42-44 (finding that defendant's ineffectiveness claim in a PSI, intended to be read by the trial court, triggered a *Krankel* inquiry). We concur with the parties that the trial court failed to conduct the necessary *Krankel* inquiry and, accordingly, remand this matter for the trial court to perform a preliminary *Krankel* investigation.

¶ 96                                 III. CONCLUSION

¶ 97    For the foregoing reasons, we affirm the judgment of the circuit court of Clark County, but remand for the limited purpose for the trial court to conduct a *Krankel* hearing.

¶ 98    Affirmed and remanded.